UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
                                                    :
BARBARA PLEENER,                                    :          05 CV 973 (ARR)
                                                    :
                              Plaintiff,            :          NOT FOR PRINT OR
                                                    :          ELECTRONIC
        -against-                                   :          PUBLICATION
                                                    :
NEW YORK CITY BOARD OF EDUCATION,                   :          OPINION AND ORDER
                                                    :
                              Defendant.            :
                                                    :
------------------------------------------------------------------------ x

ROSS, United States District Judge:

        Plaintiff Barbara Pleener, a Caucasian former high school principal, brings this action

under Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e, et seq.; 42 U.S.C. § 1983, and

State and local law, principally alleging that her former employer, defendant New York City

Board of Education ("BOE"), discriminated against her on the basis of race.  Plaintiff further

alleges that defendant both retaliated against her and defamed her by informing the press that she

was among 45 high school principals to have been replaced during the 2003-2004 school year.

Defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure.  For the reasons set forth below, defendant's motion for summary judgment is

granted in its entirety and this action is dismissed.

                                        ***BACKGROUND***

        With the exceptions discussed below, the parties agree on the facts in this case.  Before

retiring in 2004 at the age of 55, plaintiff was a longtime employee of defendant BOE.

According to plaintiff, she began as a high school English teacher in 1970, and worked for the

BOE in various other capacities before becoming a principal (Declaration of Steven L. Barkan

["Barkan Dec."], Ex. 2, at 20-25; Declaration of Eric Eichenholtz ["Eichenholtz Dec."], Ex. C at

20-25.   In 1993, plaintiff was appointed principal of Jamaica High School ("JHS") in Jamaica, Queens (Defendant's Local Rule 56.1 Statement ["Def. Stmt."] at ¶ 2; Plaintiff's Response to Defendant's 56.1 Statement ["Pl. Stmt."] at ¶ 2).  Plaintiff remained in the post for almost seven years (Barkan Dec., Ex. 2 at 26; Eichenholtz Dec., Ex. C at 26), during which time she received "satisfactory" ratings and became a tenured principal (Def. Stmt. at ¶¶ 3-5; Pl. Stmt. at ¶¶ 3-5).

In November 1998, however, a JHS teacher named Joseph Trupiano filed a complaint with the BOE's Office of Equal Employment Opportunity ("the OEO"), alleging sexual harassment (Def. Stmt. at ¶¶ 6-7; Pl. Stmt. at ¶¶ 6-7).  In June 1999, the OEO concluded, *inter alia*, that plaintiff had engaged in a relationship with Trupiano, during which plaintiff had used her position as principal to provide Trupiano with certain benefits (Def. Stmt. at ¶ 9; Pl. Stmt. at ¶ 9).  The OEO also found that plaintiff had purchased a mobile home or trailer with Trupiano – a violation of the BOE Chancellor's Regulations (Def. Stmt. at ¶ 9; Pl. Stmt. at ¶ 9).

Thereafter, plaintiff and BOE entered into a "Pre-Charge Stipulation of Settlement," which "eliminated the need for the preferral of charges and a formal hearing" (Def. Stmt. at ¶ 13; Pl. Stmt. at ¶ 13).  In this stipulation, plaintiff acknowledged violating the Chancellor's Regulations and agreed to pay a fine of $5,000 (Def. Stmt. at ¶ 14; Pl. Stmt. at ¶ 14; Eichenholtz Dec., Ex. G).  In addition, the stipulation provided that plaintiff would be transferred to another Queens school "deemed appropriate by the Superintendent," and would be assigned to the Queens Superintendent's office until such placement became available (Id.).

Plaintiff remained at the Queens Superintendent's office until 2003 (Def. Stmt. at ¶ 18; Pl. Stmt. at ¶ 18).  According to plaintiff, she was given the title of "Special Assistant to the Superintendent," and did "whatever the superintendent needed" (Def. Stmt. at ¶¶ 16-17; Pl. Stmt.

at ¶¶ 16-17).  At her deposition, plaintiff stated that she was "the supervising principal of summer and evening high schools for the borough, . . . handled all of the [C]hancellor's correspondence for the Queens high school office, and . . . handled incident reports for the borough" (Barkan Dec., Ex. 2 at 27; Eichenholtz Dec., Ex. C at 27).  In addition, by virtue of working in the Superintendent's office, plaintiff became "the go-to person for a lot of the principals in the borough," and was dispatched to help train new principals (Id.).  Plaintiff also did proofreading and occasionally "handled late night conferences" (Barkan Dec., Ex. 2 at 27-28; Eichenholtz Dec., Ex. C at 27-28).

In the Summer of 2003, the BOE underwent a system-wide reorganization which resulted in the closure of the Queens Superintendent's office and the creation of a "regional structure" (Def. Stmt. at ¶ 20; Pl. Stmt. at ¶ 20).  As a result of this reorganization, Dr. Kathleen Cashin, a Caucasian woman, became the Regional Superintendent of Region 5, which encompassed portions of Brooklyn and Queens  (Def. Stmt. at ¶ 21; Pl. Stmt. at ¶ 21).  Cashin had several positions to fill, including Deputy Superintendent, Local Instructional Superintendent and principal of Beach Channel High School  (Def. Stmt. at ¶¶ 22-23; Pl. Stmt. at ¶ 22-23).

On the recommendation of plaintiff's friend, Diane Schrecho, who Cashin was then considering for the position of Deputy Superintendent, Cashin interviewed plaintiff  (Def. Stmt. at ¶ 23; Pl. Stmt. at ¶ 23).  According to plaintiff, Cashin was prepared to appoint plaintiff to the position of Local Instructional Superintendent ("LIS"), serving under Schrecho (Eichenholtz Dec., Ex. C at 30).[1]  However, Schrecho eventually decided to remain on Long Island (id.), and a

---

[1]A Local Instructional Superintendent supervises principals (Eichenholtz Dec., Ex. D at 65).

Caucasian woman named Joan Gordon was appointed to the Local Instructional Superintendent position (Eichenholtz, Ex. C. at 40). Cashin offered plaintiff a position as principal of Beach Channel High School (Def. Stmt. at ¶ 27; Pl. Stmt. at ¶ 27).

In 2003-2004, Beach Channel High School ("BCHS"), located in Far Rockaway, had a student population which was approximately 53 percent black, 28 percent Hispanic, 17 percent white and 4 percent Asian (Def. Stmt. at ¶ 28; Pl. Stmt. at ¶ 28). According to plaintiff, there was "a lack of stability" at BCHS, which had experienced "a history of multiple principals" after the longtime principal, an African-American man named Mr. Gassaway, was promoted to Superintendent (Barkan Dec., Ex. 2 at 31, 45, Eichenholtz Dec., Ex. C at 31). In the school year before plaintiff was appointed, two individuals – both Caucasian – had served as principal (Eichenholtz Dec., Ex. C at 33).

In June 2003, shortly after plaintiff was appointed, Cashin and plaintiff met with parents in an attempt to allay their concerns (Def. Stmt. at ¶ 30; Pl. Stmt. at ¶ 30). The exact nature of their concerns is unclear. Although the parties agree that the parents wanted assurances that "their children would get a valuable and acceptable education" (Def. Stmt. at ¶ 31; Pl. Stmt. at ¶ 31), a letter provided by defendant suggests that the parents were also aware of circumstances surrounding plaintiff's removal from JHS and had "gravely expressed . . . concerns" to Cashin about plaintiff's appointment as principal of BCHS (Eichenholtz Dec., Ex. H).

The parties' recollection of the June 2003 meeting differed markedly. At her deposition, plaintiff remembered the meeting as being "very productive," and did not recall if race had ever been mentioned (Barkan Dec., Ex. 2 at 31, 43; Eichenholtz Dec., Ex. C at 31, 43). Cashin recalled "trying to tell [the parents] . . . to be receptive [to plaintiff]" (Def. Stmt. at ¶ 34; Pl. Stmt. at ¶ 34). Cashin further recalled that plaintiff's tone at the meeting undercut that effort.

4

According to Cashin, plaintiff "talked down" to the parents and displayed an autocratic, "I am

the principal attitude" (Barkan Dec., Ex. 3 at 73-74; Eichenholtz Dec., Ex. D at 73-74).  Cashin

claims that she was "shocked" by plaintiff's manner and decided after the meeting that she

would "try to work with [plaintiff] on her interpersonal connection" (Id.).  Plaintiff denies that

Cashin ever did so (Pl. Stmt. at ¶ 36).

According to plaintiff, everything went well with the students and faculty for the first few

months after late June or early July 2007, when plaintiff assumed her new post (Barkan Dec., Ex.

2 at 31; Eichenholtz Dec., Ex. C at 31, 42).  However, by plaintiff's own account, the positive

attitude "changed" following an incident involving a Haitian Assistant Principal, Claude

Monereau (Barkan Dec., Ex. 2 at 43; Eichenholtz Dec., Ex. C at 43).

That incident began on September 26, 2003, during a meeting of plaintiff's "cabinet."[2]

According to a signed statement plaintiff prepared following the meeting, Monereau confronted

plaintiff with rumors that she intended to remove five assistant principals (Eichenholtz Dec., Ex.

J).  When plaintiff denied it and asked Monereau for the source of the rumor, Monereau boasted

that he had "got[ten] rid" of the two previous principals, and threatened that he would do the

same to plaintiff if she attempted "to do anything to us" (Id.).  He then stated, "Mr. Gassaway

ran a great school and it was like a church in here or a synagogue to you" (Id.)  When plaintiff

replied that she was not Gassaway, Monereau said, "You are not a person of color" (Id.).

Plaintiff felt "threatened" by these comments, which she characterized as "accusatory

remarks, along with a racial slur" (Def. Stmt. at ¶¶ 42-43; Pl. Stmt. at ¶¶ 42-43).  Plaintiff claims

she was aware, from correspondence which she had read during her years in the Queens

---

[2]According to plaintiff, the "cabinet" consisted of the assistant principals and various
other people, such as the program chair or coordinator of student affairs, who "assist in the
decision making process of the school" (Eichenholtz Dec., Ex. C at 35).

Superintendent's office, that Monereau had lobbied for the principal's position in the past (Eichenholtz Dec., Ex. C at 34).  Moreover, plaintiff purported to "know for a fact" that the parents wanted Monereau to be the principal of BCHS (Id.).

Immediately after the meeting, plaintiff spoke with Gordon and requested "some direction" on how best to proceed  (Def. Stmt. at ¶ 44; Pl. Stmt. at ¶ 44).  As a result, Cashin and Gordon investigated the incident, and concluded that Monereau had made "inappropriate, threatening and insubordinate public comments" to plaintiff, including stating that plaintiff was not a "person of color"  (Def. Stmt. at ¶ 51; Pl. Stmt. at ¶ 51; Eichenholtz Dec., Ex. K).  On October 3, 2003, Cashin reassigned Monereau, removing him from BCHS (Def. Stmt. at ¶ 46; Pl. Stmt. at ¶ 46).

Monereau, who had been working at BCHS for 20 years prior to removal, had ties to the parents and the school community (Def. Stmt. at ¶¶ 47-48; Pl. Stmt. at ¶¶ 47-48).  The news of his removal from BCHS was not well received by at least some students and parents.  For example, one student drafted a petition which accused plaintiff of firing Monereau because she was jealous that the students applauded him and booed her during an assembly and concluded:

> MRS. PLEENER MUST GO!!!!!!!!!  LET'S FIGHT TO BRING
> MR. MONEREAU BACK NOW!!!!!!!!!!

(Barkan Dec., Ex. 9). At around the same time, the Executive Board of the BCHS Parent Teacher Association (the "PTA"), sent Cashin a letter dated October 7, 2003, urging Monereau's reinstatement and threatening to "pursue . . . further actions" unless Cashin reconsidered what the PTA termed "an unjust and harsh punishment" (Eichenholtz Dec., Ex. H).  The letter further informed Cashin that two meetings had been scheduled – an "emergency community meeting" on October 9, 2003, at a local church and an "emergency general PTA meeting" on October 15,

2007, at BCHS – and urged Cashin to attend (Id.).  While the letter contrasted Monereau's treatment with that which plaintiff herself had received following her misconduct at JHS, the letter made no express references to plaintiff's race.   However, at least one of the fliers circulated in advance of the October 9 meeting accused plaintiff of being a racist (Barkan Dec., Ex. 9).

Cashin became directly involved in the situation at BCHS.  Plaintiff claims that, at one point, Cashin told her "she would handle it because she knew how to handle it" (Barkan Dec., Ex 2 at 62).[3]  As plaintiff testified at her deposition:

> This whole thing was taken out of my hands and they, the superintendent's office and the people from the superintendent's office were running the show and so I was at certain points delegated to be just a cog in the wheel and to do what was asked of me.

(Id. at 65).  Although it is unclear precisely how many times Cashin visited BCHS in the three weeks after Monereau was removed, or precisely what she did there, plaintiff concedes that she was there three times before October 23, 2003, and that she toured the school with plaintiff on one of these visits (Pl. Stmt. at ¶ 69).

Despite the efforts of Cashin and plaintiff, tensions remained high on October 15, 2003, the date of the emergency general PTA meeting.  Plaintiff hired a bodyguard for the meeting (Barkan Dec., Ex. 2 at 66; Eichenholtz Dec., Ex. C at 66) and, according to plaintiff, Cashin arranged to have cars parked in the back of the school so that she, plaintiff and other BOE personnel could leave through the back door if necessary (Barkan Dec., Ex. 2 at 67).  That day, the New York Post ran a story about the situation at BCHS, describing it as a "racially charged

---

[3]According to plaintiff, Cashin had experience working in the Ocean Hill-Brownsville area of Brooklyn and "knew how to handle black parents" (Barkan Dec., Ex. 2 at 62-63).

battle" (Barkan Dec., Ex. 10).  Channel 7 dispatched a news team to cover the PTA meeting (Barkan Dec., Ex. 2 at 67).[4]

The meeting did nothing to lessen the tensions.  While it is unclear exactly what transpired that evening, both Cashin and plaintiff testified at depositions that Cashin led plaintiff and other BOE personnel out of the room before the meeting was over (Barkan Dec., Ex. 2 at 67-68; Eichenholtz Dec., Ex. D at 43).  According to Cashin, she was prompted to do so because plaintiff looked "uncomfortable," and Cashin was "uncomfortable for her" (Eichenholtz Dec., Ex. D at 43).  Plaintiff thought it was a mistake to walk out; at her deposition, she testified that she "felt if I walked out there was never any opportunity to have any kind of exchange" (Barkan Dec., Ex. 2 at 67-68).  However, she also felt she "couldn't disobey the superintendent" (Id. at 68).  The crowd permitted plaintiff, Cashin and her entourage to leave without incident, but exhibit some "negative" reactions (Barkan Dec., Ex. 2 at 68), which made it clear that they "weren't too thrilled"  (Eichenholtz Dec., Ex. D at 43).

Thereafter, adults began to picket on a traffic island outside of the school (Barkan Dec., Ex. 2 at 64, 68).  At her deposition, plaintiff could not recall exactly what their placards said, although her impression was that "it escalated to get rid of the white principal, walk out until Monereau comes back, bring back Monereau," and slogans of that sort (Id. at 64).

Perhaps in response to these exhortations, the students did, in fact, walk out.  Aware that the students intended to set off the fire alarm as a signal to begin the walk out, plaintiff and her fellow administrators attempted to devise a mechanism whereby they could disconnect the alarm without compromising safety (Barkan Dec., Ex. 2 at 70).  That effort ultimately proved

---

[4]According to plaintiff, the news team was "called away" before the meeting to cover the crash of the Staten Island Ferry (Barkan Dec., Ex. 2 at 67).

unsuccessful; the students succeeded in setting off the fire alarms not only on the day of the

walk-out, but on at least one other subsequent occasion (Id. at 71).

Plaintiff took action to ameliorate the situation, such as distributing talking points to

teachers and "talk[ing] with the kids in small groups" (Barkan Dec., Ex. C at 71-72).[5]  The

students did not walk out again and plaintiff believed that the situation was improving (Barkan

Dec., Ex. 2 at 72).  However, on October 23, 2003, Cashin met with plaintiff and told plaintiff

that she would be removed from her post as principal (Def. Stmt. at ¶¶ 69, 71; Pl. Stmt. at ¶¶ 69,

71).  According to plaintiff, Cashin "made a point of saying" that she had already selected a

black assistant principal from Brooklyn – Dr. David Morris – to replace her (Barkan Dec., Ex. 2

at 73).  When asked at her deposition to explain her theory as to why Cashin had reached the

decision to replace her with Morris, plaintiff did not mention her own race but speculated that

Cashin had used her as a scapegoat:

> Q:    Do you have any idea why it was that Dr. Cashin had
>       reached this particular decision?
>
> A:    Oh, absolutely.
>
> Q:    Why is it that Dr. Cashin reached this decision?
>
> A:    Because she had told me very clearly that she was able to
>       control and deal with the black population and the parents
>       and that she was going to handle it and then she couldn't
>       and so I was the sacrificial person and I was convinced of
>       that as soon as she told me who the replacement was.
>
> Q:    Was there anything that she said or did that led you to
>       believe that you had been chosen as the sacrificial person

---

[5]In an unsigned and unsworn declaration submitted as part of her opposition papers, plaintiff explains that she decided not to talk to the students in a large assembly because "once gathered together, they could riot" (Plaintiff's Declaration in Opposition to Defendant's Motion for Summary Judgment at 3).

other than the conversation that you just described to me?

A:     Other than the fact that I was out and somebody else was in
and she was the person who hired him, no, that was
enough.  She never once said to the parents Ms. Pleener
never fired this man or this man is not fired, she never once
said this.  She never said it's not a black issue versus a
white issue.  She was going to control what they thought
was a black and white issue.  She created that whole
scenario which she really in my opinion didn't have to do.

(Barkan Dec., Ex. 2 at 73-74; Eichenholtz Dec., Ex. C at 73-74).

Cashin's recollection of the October 23 meeting differed from plaintiff's.  When asked at

her deposition what reasons she gave plaintiff for her removal, Cashin stated:

My recollection is that at this point she basically wasn't leaving
her office and that she wasn't fulfilling the mandates of her
position and that the school was not in good shape and we needed
to get someone who could exude the leadership to bring it to a
stable condition.

(Barkan Dec., Ex. 3 at 60; Eichenholtz Dec., Ex. D at 60).  Cashin testified that she "was in the

school at lot," that "nothing was calming down," and that things "seemed to remain the same."

(Eichenholtz Dec., Ex. D at 49-50).  Cashin claimed that she was "concerned that the situation

was not improving" (id. at 49), and was "concerned about [plaintiff]," who "appeared to [Cashin]

to be very frightened and really could not do the job because of it" (Barkan Dec., Ex. 3 at 59;

Eichenholtz Dec., Ex. D at 59).

After she left BCHS, plaintiff received a call at home from Gordon, who told her to

report to the Superintendent's office (Eichenholtz Dec., Ex. C at 79).  According to plaintiff, she

reported as directed and spent two days at that office without being assigned a desk or being

given anything to do (Barkan Dec., Ex. 2 at 80; Eichenholtz Dec., Ex. C at 80).  However, at the

end of the second day, an LIS named Janice Medina told plaintiff to report to Franklin K. Lane

High School ("LHS") the following day and apologized for failing to tell plaintiff sooner (Id.).

Plaintiff claims that, at first, she was not given any written directions concerning what to do at LHS and "had to assist wherever [she] could" (Barkan Dec., Ex. 2 at 81; Eichenholtz Dec., Ex. C at 81). At some point, the principal there asked plaintiff to assist a "new and pregnant" Assistant Principal (id.), but the record does not indicate what assistance plaintiff provided or for how long. However, by letter dated December 22, 2003, LIS Medina gave plaintiff a specific assignment. See Eichenholtz Dec., Ex. H. It is unclear what title, if any, plaintiff had during her time at LHS, though plaintiff testified that her salary remained the same (Barkan Dec., Ex. 2 at 81; Eichenholtz Dec., Ex. C at 81).

Cashin claims that in the weeks following plaintiff's removal, she "became gradually more aware that there were very negative interactions between the parents, the principal and the children" during plaintiff's tenure at BCHS (Barkan Dec., Ex. 3 at 72; Eichenholtz Dec., Ex. D at 72). Although most, if not all, of the complaint may have come from parents active in the PTA, Cashin testified at her deposition that she considered them to be "serious allegations" (Barkan Dec., Ex. 3 at 76).

On November 10, 2003, Cashin and Gordon entered into a stipulation with Monereau, in which they agreed to assign Monereau to a position as an ESL/Bilingual Instruction Support Specialist in Region 5 (Eichenholtz Dec., Ex. N). In return, Monereau agreed, inter alia, not to commence any actions against Cashin, Gordon, plaintiff or BOE (Id. at ¶ 5). Around the same time, a Dr. Mullens – who was allegedly active in the effort to remove plaintiff – was hired to work at BCHS, although Cashin denied having any role in his hiring (Barkan Dec., Ex. 3 at 64).

On the same day she entered into the stipulation with Monereau, Cashin sent plaintiff a letter directing plaintiff to meet with her to "discuss allegations regarding your behavior toward

11

students and parents at Beach Channel High School, during your principalship" (Eichenholtz

Dec., Ex. S).  The letter further advised plaintiff that the meeting might "lead to further

disciplinary action," and that she could bring union representatives with her (Id.)

Plaintiff brought two union representatives to the meeting, which was held on November

13, 2003 (Def. Stmt. at ¶ 86; Pl. Stmt. at ¶ 86).  By all accounts, there was a discussion at the

meeting about the fact that, during her tenure at BCHS, plaintiff had been on the payroll of

Region 3, not Region 5 (Barkan Dec., Ex. 2 at 76, Ex. 3 at 67; Eichenholtz Dec., Ex. D at 67).

The parties agree that Cashin told plaintiff that she did not have money in the budget to pay

plaintiff, and that there was some discussion about the possibility that plaintiff might retire (Id.).

The parties disagree about the context in which retirement was raised.  Plaintiff claims that

Cashin said:

> I guess we'll pay them [Region 3] eventually but I don't have the
> money to pay you[.]  I need you to retire . . . .

(Barkan Ex. 2 at 76).  Cashin, however, denies that she ever told plaintiff she would have to

leave, and claims that she "reached out to other regionals to see if there was an appropriate

opening" (Barkan Dec., Ex. 3 at 67; Eichenholtz Dec., Ex. D at 67).  Cashin's deposition

testimony suggests that she may have talked to plaintiff about some "options" – including the

option that plaintiff would take terminal leave, "use up her days," and then retire with "full pay" –

but Cashin claims that it was plaintiff's union that proposed this option (Id.).

The parties also disagree about the substance of the discussion concerning possible

disciplinary charges.  At her deposition, Cashin stated that she did not tell plaintiff that she

intended to bring disciplinary charges against her and "was hoping not to have to" (Barkan Dec.,

Ex. 3 at 68; Eichenholtz Dec., Ex. D at 68).  However, plaintiff recalled that Cashin at least

implied that she would bring disciplinary charges, saying "that that was pretty much the direction she was going to have to go in" (Eichenholtz, Ex. C at 90). According to plaintiff, Cashin admitted that she had not yet investigated the complaints against plaintiff (Barkan Dec., Ex. 2 at 76), prompting plaintiff to believe that Cashin was on "some kind of a witch hunt" and "had an agenda that was far different from whatever she had on paper" (<u>Id</u>.).

According to plaintiff, Cashin's deputy, Steven Mittman, called plaintiff into his office the following day and said, "You're retiring, right?" (Barkan Dec., Ex. 2 at 76-77). After plaintiff told Mittman that she had no intention of doing so and was not old enough to retire, the meeting ended "with absolutely nothing happening" (<u>Id</u>.).

Sometime thereafter, plaintiff had discussions with various union representatives who had allegedly been in contact with Cashin. According to plaintiff, she "was told specifically [Cashin] was going to make [plaintiff's] life miserable" (Barkan Dec., Ex. 2 at 81-82). At least one of the union representatives "assumed" that Cashin was going to start disciplinary proceedings against plaintiff (Barkan Dec., Ex. 2 at 82). In addition, plaintiff recalled a conversation with Cashin's "original superintendent," Ben Waxman:

> Waxman . . . said you have to understand it's not been your competence . . . but it's this political thing that is going on . . . [.] I said what are you talking about, he said you know, it's a black/white issue, you got to go.

(<u>Id</u>.) When asked whether Waxman "said that about [plaintiff's] leaving Beach Channel or retiring," plaintiff stated:

> Well, leaving Beach Channel as far as they were concerned forced me into retiring because she meaning Dr. Cashin had nothing, nowhere else to put me and that's what she said, I don't have anywhere to put you.

(<u>Id</u>.).

By all accounts, Cashin did not take any action against plaintiff immediately after the November 13, 2003, meeting. Disciplinary proceedings were not initiated, and plaintiff continued to work at LHS until sometime in January 2004 (Def. Stmt. at ¶ 81; Pl. Stmt. at ¶ 81).

In January 2004, plaintiff was transferred from LHS back to the Regional Superintendent's office. However, plaintiff worked there for only about one day before going on terminal leave (Def. Stmt. at ¶ 82; Pl. Stmt. at ¶ 82). According to plaintiff, on her only full day at that office, she was given a place to sit but not much to do, other than a little proofreading (Barkan Dec., Ex. 2 at 88; Eichenholtz Dec., Ex. C at 88). The very next day, she visited her union representatives and agreed to resign (Id.).

At her deposition, plaintiff gave two reasons for her decision to retire. First, she testified that she "felt that [she] was going to now sit again in the super's office with nothing to do or menial tasks to do like Xeroxing" (Eichenholtz Dec., Ex. C at 93). Second, she "was led to believe" that Cashin was prepared to initiate disciplinary proceedings against her pursuant to New York Education Law § 3020-a and "felt that [she] could not go through with 3020-[a] on this nonsense" (Eichenholtz Dec., Ex. C at 89, 93).

The union representatives worked out an arrangement with the BOE, whereby plaintiff would be permitted to go on terminal leave and retire on July 1, 2004, when she had reached age 55, the minimum age for retirement (Eichenholtz Dec., Ex. C at 93). According to plaintiff, Cashin wanted plaintiff "to sign something that saying that [plaintiff] wouldn't sue her or the board of ed for discrimination and . . . promised . . . never [to] come back to work again" (Id. at 89). Plaintiff refused to sign, but was nonetheless permitted to take terminal leave and to retire on July 1, 2004 (Def. Stmt. at ¶¶ 82, 96; Pl. Stmt. at ¶¶ 82, 96).

In June 2004, BOE released a list which identified plaintiff as one of 45 principals who

14

had been removed from principal positions during the 2003-2004 school year (Def. Stmt. at ¶ 100; Pl. Stmt. at ¶ 100).  On June 29, 2004, The New York Times published an article concerning the list, entitled, "Klein Says He Has Ousted 45 Principals" (Def. Stmt. at ¶ 101; Pl. Stmt. at ¶ 101).  The article itself mentioned BOE Chancellor Joel Klein's "desire to hold principals to higher standards and to dismiss poor performers," and quoted BOE officials as stating that they had removed the 45 principals "for poor performance" (Eichenholtz Dec., Ex U).  Other papers, such as the New York Post and New York Daily News also published articles about the list (Barkan Dec., Ex 12).  All of the articles specifically identified plaintiff as one of the 45 principals (Eichenholtz Dec., Ex. U; Barkan Dec., Ex. 12).

In or about July 2004, plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") (Def. Stmt. at ¶ 103; Pl. Stmt. at ¶ 103).  After investigation, the EEOC was unable to conclude that the information obtained established a statutory violation and issued a "right-to-sue" letter to that effect on November 23, 2004 (Def. Stmt. at ¶ 104; Pl. Stmt. at ¶ 104; Complaint, Ex. 1).  Plaintiff commenced this action on February 22, 2005 (Def. Stmt. at ¶ 105; Pl. Stmt. at ¶ 105).

### Plaintiff's Complaint

Plaintiff's complaint emphasizes the racial aspects of the events at BCHS, asserting that Monereau and the NAACP had purposely transformed "a disciplinary issue into a racial issue of a White principal in a Black school" (Complaint at ¶ 23).  Plaintiff's complaint alleges that Cashin "caved in" to "racial intimidation" when she removed plaintiff from her position as principal of BCHS and replaced her with an African-American (id. at ¶¶ 25-26), and when she constructively discharged plaintiff while retaining and promoting Monereau and hiring Mullens (Id. at ¶¶ 27-28, 30, 31-34).  The complaint further alleges that that BOE's decision to name plaintiff as one of the

45 principals who had been dismissed constituted retaliation for plaintiff's refusal to sign a release relinquishing her right to sue for discrimination (Id. at ¶¶ 35-38).

The complaint alleges five causes of action. The first two allege that plaintiff's removal as principal of BCHS and "constructive discharge" violated Title VII and 42 U.S.C. § 1983. The third cause of action alleges that defendant violated Title VII by retaliating against plaintiff for her refusal "to release the Defendant from the consequences of its illegal activity" (Complaint at ¶ 55). The fourth and fifth causes of action allege violations of the New York State Human Rights Law (N.Y. Exec. Law § 296 et seq.), and the Human Rights Law of the City of New York (N.Y. City Admin. Code 8-107 et seq.).

***Defendant's Motion for Summary Judgment***

Defendant now moves for summary judgment, raising five separate arguments. First defendant argues that plaintiff cannot make out a prima facie case of race discrimination and, in any event, cannot establish that Cashin's stated reason for removing plaintiff from her post at BCHS was pretextual. Second, defendant asserts that plaintiff cannot make out a prima facie case of retaliation under Title VII. Third, defendant maintains that plaintiff's § 1983 claims must be dismissed pursuant to Monell v. New York City Dep't of Social Servs., 436 U.S. 658 (1978), for failure to establish the violation of any municipal policy or custom. Defendant's fourth argument seeks to dismiss plaintiff's fourth and fifth causes of action for failure to file the requisite notices of claim. Finally, defendant's fifth argument seeks to preclude plaintiff from recovering front or back pay, alleging that she failed to mitigate damages because she failed to look for another job. These arguments, and plaintiff's response thereto, are discussed in more detail below.

***DISCUSSION***

**I.     *Summary Judgment Standard***

16

Summary judgment shall be granted if the court determines that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To determine which facts are material, the court must look to the substantive law that supplies the basis for the claims at issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A "genuine issue of material fact" exists if the evidence is such that a reasonable jury could find in favor of the non-moving party. Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). The moving party bears the burden of establishing the absence of any genuine issue of material fact. Anderson, 477 U.S. at 256. If the moving party meets its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Summary judgment should only be granted when it is apparent that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight." Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.2d 1219, 1223 (2d Cir. 1994).

In deciding a summary judgment motion, the court must "resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion." Cifarelli v. Babylon, 93 F.3d 47, 51 (2d Cir. 1996). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247–48. Therefore, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To defeat a properly supported motion for summary judgment, the opposing party must set forth specific facts indicating that a genuine issue of material fact exists; "[s]tatements that are devoid of any specifics, but replete with conclusions" are

17

insufficient to defeat a motion for summary judgment.  Bickerstaff v. Vassar College, 196 F.3d

435, 452 (2d Cir. 1999).

## II.    *Plaintiff's Title VII Claims*

Title VII of the Civil Rights Act of 1964 makes it unlawful "for an employer to

discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of the individual's race, color, religion, sex, or national

origin."  42 U.S.C. § 2000e-2(a)(1).  The anti-retaliation provision of Title VII forbids employers

from "discriminating against" an employee or job applicant because that individual "opposed any

practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a

Title VII  proceeding or investigation. 42 U.S.C. § 2000e-3(a).

The general burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S.

792 (1973), applies equally to discrimination and retaliation claims under Title VII.  Jute v.

Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005); Farias v. Instructional Sys., Inc.,

259 F.3d 91, 98 (2d Cir. 2001).  Under this burden-shifting framework, plaintiff bears the initial

burden of making out a prima facie case of discrimination.  Id.  Plaintiff's burden of proof at this

stage of the analysis has been characterized as "'minimal' and 'de minimis,'" Woodman v.

WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005) (quoting Zimmerman v. Assocs. First Capital

Corp., 251 F.3d 376, 381 (2d Cir. 2001), but "it is not non-existent."  Spiegel v. Schulmann, No.

03-CV-5088 (SLT)(RLM), 2006 WL 3483922, at *12 (E.D.N.Y. Nov. 30, 2006) (quoting

Almond v. Westchester County Dep't of Corrections, 425 F. Supp. 2d 394, 399 (S.D.N.Y. 2006)).

If plaintiff makes the required prima facie showing, a presumption of discrimination or

retaliation arises and the burden of production shifts to defendant, who must then articulate a

legitimate non-discriminatory or non-retaliatory reason for the adverse employment action.  Jute,

18

420 F.3d at 173; Farias, 259 F.3d at 98.  The determination of whether or not the defendant has

met this burden "can involve no credibility assessment."  St. Mary's Honor Ctr. v. Hicks, 509

U.S. 502, 509 (1993).  Rather, the relevant inquiry is whether the defendant has introduced

evidence which "taken as true, would permit the conclusion that there was a nondiscriminatory

reason for the adverse action."  Id. (emphasis in original).

       "[O]nce a minimal prima facie case is proved and the employer's nondiscriminatory

explanation has been given, the McDonnell Douglas presumptions disappear from the case."

James v. New York Racing Ass'n, 233 F.3d 149, 156 (2d Cir. 2000).  To defeat summary

judgment, a plaintiff must provide "admissible evidence . . . [of] circumstances . . . sufficient to

permit a rational finder of fact to infer that the defendant's employment decision was more likely

than not based in whole or in part on discrimination."  Terry v. Ashcroft, 336 F.3d 128, 138 (2d

Cir. 2003).  The court must "examine the entire record and . . . make the case-specific assessment

as to whether a finding of discrimination may reasonably be made."  Zimmermann, 251 F.3d at

382.

       Since "direct evidence of discriminatory intent is rare and such intent often must be

inferred from circumstantial evidence found in affidavits and depositions," courts must exercise

"an extra measure of caution" before granting summary judgment in discrimination cases.

Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006); Holtz, 258 F.3d at 69.

Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in

cases lacking genuine issues of material fact."  Id. (quoting McLee v. Chrysler Corp., 109 F.3d

130, 135 (2d Cir. 1997)).  A defendant "will be entitled to summary judgment . . . unless the

plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination."

Farias, 259 F.3d at 98 (quoting James, 233 F.3d at 154).

The analysis is similar for retaliation claims.  If the plaintiff makes out a prima facie case of retaliation and the defendant articulates a legitimate, non-retaliatory reason for the adverse employment action, the plaintiff "must show that retaliation was a substantial reason for the adverse employment action." Jute, 420 F.3d at 173.  To avoid summary judgment the plaintiff must adduce evidence sufficient to raise an issue of fact as to whether the employer's reason was merely a pretext for retaliation.  See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998).

## A.    *Plaintiff's Discrimination Claims*

To make out a prima facie case of racial discrimination under Title VII, plaintiff must show that (1) she is a member of a protected class; (2) she was performing her duties satisfactorily; (3) she suffered an adverse employment action and (4) the adverse action occurred under circumstances giving rise to an inference of race discrimination.  See Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005) (citing Farias, 259 F.3d at 98).  Defendant concedes that plaintiff has made out the first two elements, but contends that plaintiff has not sustained the burden of proving that she suffered any adverse employment actions or that such actions occurred under circumstances giving rise to an inference of discrimination.  Defendant further argues that, even if plaintiff has met her initial burden of proving a prima facie case, it has articulated legitimate, non-discriminatory reasons for its actions, and that plaintiff cannot adduce evidence to establish that those reasons are pretextual.

The parties agree that the facts in this case suggest only two conceivable adverse employment actions:  (1) Cashin's removal of plaintiff from her post as principal of BCHS and (2) Cashin's actions following the November 13, 2003, meeting, which, plaintiff alleges, resulted in her constructive discharge.  In arguing that plaintiff has not made out the third element of a

20

prima facie discrimination claim, defendant focuses primarily on the latter, arguing that plaintiff cannot establish that she was constructively discharged.  Defendant notes that under New York Education Law § 3020-a, plaintiff , as a tenured principal, could not be terminated without first having a hearing before an impartial arbitrator.  Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def. Memo") at 6.  Defendant argues that since plaintiff had this right to arbitrate, the threat of disciplinary charges alone could not create the "intolerable" working conditions necessary to a constructive discharge theory.

This Court agrees with defendant.  A claim for constructive discharge "requires the plaintiff to prove that her employer deliberately and discriminatorily created work conditions 'so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'"  Ferraro v. Kellwood Co., 440 F.3d 96, 101 (2d Cir. 2006) (quoting Pa. State Police v. Suders, 542 U.S. 129, 141 (2004)).  However, "courts in this circuit generally have refused to find a constructive discharge where an employee had an avenue through which he [or she] could seek redress for the allegedly 'intolerable' work atmosphere leading up to his [or her] resignation, but failed to take advantage thereof."  Silverman v. City of New York, 216 F. Supp. 2d 108, 115 (E.D.N.Y. 2002) (citing cases).

Citing to Silverman, plaintiff acknowledges that "courts have failed to find constructive discharge where there was an avenue of redress," and concedes that "it is true that Plaintiff could have fought the disciplinary charges threatened by Dr. Cashin by demanding a 3020[-]a Hearing."  Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl. Memo") at 8-9.  However, plaintiff alleges that "even if she was successful in the . . . 3020[-]a proceeding the superintendent would have fired her or forced her out by providing intolerable work assignments and if she refused to perform them, terminate[d] her for insubordination because she

had no money to pay her." Id. at 9. To substantiate this allegation, plaintiff offers only her own

unsworn allegations that this is "how the system worked," saying that:

> On a number of occasions she observed assistant principals of [sic]
> principals that their superiors wanted ousted from their position
> forced to either take a choice of an unwanted assignment or lose
> their position and any other position because they fought the
> unwarranted charges . . . .

Id. at 9-10.

Even assuming that plaintiff was entirely correct in her observations, there is no evidence

to suggest that Cashin ever subjected plaintiff to intolerable working conditions. Although

plaintiff testified that, following her removal from BCHS, she spent some time in the Region 5

Superintendent's office with neither an assigned desk nor any work to do, Barkan Dec., Ex. 2 at

80; Eichenholtz Dec., Ex. C at 80, a close reading of plaintiff's testimony reveals that plaintiff

spent only two days under these conditions before being informed that she should report to LHS.

Id. While she initially had no written assignment at LHS and "had to assist wherever [she]

could," Barkan Dec., Ex. 2 at 81; Eichenholtz Dec., Ex. C at 81, the principal at LHS found work

for her to do until December 22, 2003, when plaintiff received a written assignment from LIS

Medina. Id., Eichenholtz Dec., Ex. H. There is nothing to suggest that plaintiff was without a

desk or made to sit idly during any of her time at LHS.

Similarly, while plaintiff may have spent another day or two at the Superintendent's office

without any assigned tasks following her return from LHS in January 2004, plaintiff endured

these conditions for less than two days before going to her union to arrange her resignation.

While plaintiff testified that she "felt that [she] was going to now sit again in the super's office

with nothing to do or menial tasks to do like Xeroxing" (Eichenholtz Dec., Ex. C at 93), plaintiff

has not adduced any evidence to substantiate her speculation. Accordingly, this court concludes

that the evidence provided by plaintiff is insufficient to make out constructive discharge.

Furthermore, even if plaintiff had adduced adequate evidence of constructive discharge, there is nothing to suggest that this adverse action occurred under circumstances giving rise to an inference of racial discrimination.  To the contrary, plaintiff's own theory is that Cashin would have either fired plaintiff or otherwise forced her to quit because Cashin had no money in the Region 5 budget to pay plaintiff.  In her memorandum of law, plaintiff expressly alleges that, even if she proved "successful in the . . . 3020[-]a proceeding the superintendent would have fired her or forced her out . . . because she had no money to pay [plaintiff]."  Pl. Memo at 9.  Plaintiff repeats that same assertion later in her memorandum, alleging that "because there was no money to pay her, . . . she knew that she would be terminated by one means or the other . . . ."  Id. at 10.  Plaintiff's memorandum of law does not even suggest that Cashin's alleged desire to force plaintiff to retire had anything to do with plaintiff's race.  Rather, plaintiff alleges only that her removal from BCHS was the result of racial discrimination.  Pl. Memo at 11.

This court need not address the issue of whether the evidence concerning plaintiff's removal from BCHS is sufficient to make out a prima facie case of discrimination.  Even assuming, arguendo, that plaintiff has made out a prima facie case, there is no question that defendant has proffered a legitimate, non-discriminatory reason for its actions, and that plaintiff cannot adduce evidence to establish that this reason is pretextual.

First, it is beyond question that defendant has articulated a non-discriminatory reason for plaintiff's removal from BCHS.  The undisputed facts indicate that Monereau's removal from BCHS on October 3, 2003, created a disruption within the school and surrounding community.  Cashin testified at her deposition that she "was in the school at lot," that "nothing was calming down," and that things "seemed to remain the same." (Eichenholtz Dec., Ex. D at 49-50).  There

23

is no question that plaintiff, who was perceived within the school and community as the moving

force behind Monereau's removal, was at the very center of the controversy.  Indeed, there was

such hostility toward plaintiff that she felt the need to bring a bodyguard to protect her at the PTA

meeting on October 15, 2003.

According to Cashin, plaintiff "appeared to . . . be very frightened and really could not do

the job because of it" (Barkan Dec., Ex. 3 at 59; Eichenholtz Dec., Ex. D at 59).  At her

deposition, Cashin stated her reasons for removing plaintiff from BCHS as follows:

> My recollection is that at this point she basically wasn't leaving her
> office and that she wasn't fulfilling the mandates of her position
> and that the school was not in good shape and that we needed to get
> someone who could exude the leadership to bring it to a stable
> condition.

(Barkan Dec., Ex. 3 at 60; Eichenholtz Dec., Ex. D at 60).

This evidence, if taken as true, permits the conclusion that Cashin had a non-

discriminatory reason for removing plaintiff from her post as principal.  See St. Mary's Honor

Ctr., 509 U.S. at 509.  Under the McDonnell Douglas framework, the burden is therefore on

plaintiff to "point to evidence that reasonably supports a finding of prohibited discrimination."

See Farias, 259 F.3d at 98; James, 233 F.3d at 154.  However, plaintiff has not met this burden.

In arguing that Cashin's stated reason was pretextual, plaintiff first asserts that Cashin

based her decision on limited observations and incorrectly concluded that the situation at BCHS

was not improving.  In her memorandum of law, plaintiff asserts – without citing to any specific

portions of the record – that Cashin "was only in the school on three occasions aster [sic]

Monereau was removed," and that "the school was recovering under the Plaintiff's leadership."

Pl. Memo at 14-15.  Even assuming that there was evidence to substantiate the later assertion,

such evidence would establish only that Cashin was mistaken, not that she acted with racial

animus.

Indeed, in her memorandum of law, plaintiff specifically states that she "has never claimed that Dr. Cashin is a racist." Pl. Memo at 13. Rather, plaintiff alleges that Cashin removed her "to quiet the racial tension created by the black community." Id. Plaintiff points to evidence that Cashin or BOE took other steps to buy racial peace, such as appointing a black principal, hiring Mullens and retaining, and ultimately promoting, Monereau. Id. at 15.

However, this evidence suggests only that race may have been a factor in these other employment actions. Plaintiff cannot point to any admissible evidence that reasonably supports the conclusion that Cashin discriminated against her because she was white. In fact, when asked at her deposition for her theory as to why Cashin had removed her, plaintiff asserted that Cashin was using her as a scapegoat. Plaintiff stated:

> [Cashin] had told me very clearly that she was able to control and deal with the black population and the parents and that she was going to handle it and then she couldn't and so I was the sacrificial person . . . .

(Barkan Dec., Ex. 2 at 73; Eichenholtz Dec., Ex. C at 73). Plaintiff further faulted Cashin for failing to defuse the racial tensions, saying:

> [Cashin] never once said to the parents Ms. Pleener never fired this man or this man is not fired, she never once said this. She never said it's not a black issue versus a white issue. She was going to control what they thought was a black and white issue. She created that whole scenario when she really in my opinion didn't have to.

(Barkan Dec., Ex. 2 at 74; Eichenholtz Dec., Ex. C at 74). Plaintiff did not assert that her race was the cause of her removal.

Since plaintiff has not made out constructive discharge or pointed to any evidence that reasonably supports a finding that her removal from BCHS was prompted by race discrimination,

defendant's motion for summary judgment with respect to plaintiff's discrimination claims is

granted.  Plaintiff's Title VII discrimination claims are dismissed.

**B.    *The Retaliation Claim***

To make out a prima facie case of retaliation, plaintiff must show that (1) she participated

in a protected activity; (2) defendant knew of the protected activity; (3) plaintiff suffered an

adverse employment action; and (4) there was a causal connection between the protected activity

and the adverse employment action.  See Jute, 420 F.3d at 173.  Defendant argues that plaintiff

has failed to make out a prima facie case.  First, defendant argues that plaintiff did not engage in a

protected activity by refusing Cashin's request, conveyed to her by union representatives, that she

sign a document promising not to sue Cashin or BOE for discrimination.  Second, defendant

asserts that plaintiff was not subjected to an adverse employment action.  Third, defendant argues

that plaintiff has not adduced any proof of a causal connection.

In response to defendant's first argument, plaintiff implies that her refusal to provide the

release Cashin requested signaled that she was "contemplating commencing an action or EEOC

claim."  Pl. Memo at 15.  A plaintiff's refusal to sign a waiver of rights can constitute protected

activity, but only if that refusal communicates an intent to complain about discriminatory

employment practices.  Bottge v. Suburban Propane, 77 F. Supp. 2d 310, 313 (N.D.N.Y. 1999).

In this case, the release from liability was only a part of the document Cashin allegedly wanted

plaintiff to sign; plaintiff testified that Cashin wanted plaintiff "to sign something saying that

[plaintiff] wouldn't sue her or the board of ed for discrimination and . . . promised . . . never [to]

come back to work again" (Eichenholtz Dec., Ex. C at 89).  By all accounts, Cashin did not insist

that plaintiff provide such a document, but permitted plaintiff to go on terminal leave even after

she refused to sign.  There is no evidence to suggesting that Cashin or the BOE was aware, based

on plaintiff's refusal to sign, that she intended to sue them.

With respect to defendant's second argument, plaintiff identifies two adverse employment actions which allegedly resulted from plaintiff's refusal to sign. First, plaintiff alleges that defendant placed her name on "a list of incompetent principals" which was disseminated to the press. Second, plaintiff alleges that Cashin did not provide her with the rating or reference necessary for her to obtain another job.

Even assuming that these alleged acts constituted adverse employment actions, however, plaintiff has not provided any evidence to suggest that these actions had any connection whatsoever with her refusal to sign a release. "[A] plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link." Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir. 2004). Rather, "he [or she] must produce 'some tangible proof to demonstrate that [his or her] version of what occurred was not imaginary.'" Id. (quoting Morris v. Lindau, 196 F.3d 102, 111 (2d Cir. 1999)).

Plaintiff has not introduced any "tangible proof" of a causal connection. While a "showing that the protected activity was followed by adverse treatment in employment" may be indirect evidence of a causal connection between the two, Cobb, 363 F.3d at 108, plaintiff has not offered any evidence of precisely when Cashin refused to provide her with the rating or references. Moreover, the newspaper articles included in the opposition papers reflect that plaintiff was only one of 45 principals named in the list disseminated by the BOE. Furthermore, the articles themselves indicate that the list was prepared and distributed by the Chancellor's office in an attempt to demonstrate that the Chancellor was fulfilling his promise to "hold principals to higher standards and to dismiss poor performers." Eichenholtz Dec., Ex. U. There is nothing to suggest that plaintiff would not have been included on this list had she signed the

release as Cashin requested.

Accordingly, this court agrees with defendant that plaintiff has not made out a prima facie case of retaliation. Defendant is granted summary judgment with respect to plaintiff's third cause of action.

### III.     *Plaintiff's § 1983 Claim*

Defendant next argues that plaintiff's claims pursuant to 42 U.S.C. § 1983 are barred by Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). Monell held that "a municipality cannot be held liable solely because it employs a tortfeasor . . . ." Id. at 691 (emphasis in original). To keep § 1983 from including respondeat superior liability, Monell held that municipal entities are liable under § 1983 "only if 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers' or is conducted 'pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.'" Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003) (quoting Monell, 436 U.S. at 690-91). Defendant argues that "the record is devoid of any evidence that the actions taken herein were motivated by some unconstitutional policy, practice or custom of the Board," and that the alleged actions related to plaintiff's case alone. Def. Memo at 20.

Plaintiff responds in a single paragraph, alleging that Cashin had final decision-making authority with respect to Region 5 and plaintiff. Plaintiff reasons that Cashin had "final authority to remove Plaintiff from BCHS," and that "if she used this power to violate Plaintiff's constitutional rights the Defendant can be held accountable under section 1983." Pl. Memo at 16.

Plaintiff is correct in asserting that actions by an individual with final decision-making authority in a municipality may constitute official policy for purposes of a § 1983 claim. See

Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84 (1986). However, as the Pembaur Court

noted, "[t]his does not mean that every act of municipal officers with final authority. . . represents

the policy of the municipality." Id. at 486. "The fact that a particular official – even a

policymaking official – has discretion in the exercise of particular functions does not, without

more, give rise to municipal liability based on an exercise of that discretion." Id. at 481-82.

Rather, "the challenged action must have been taken pursuant to a policy adopted by the official

or officials responsible . . . for making policy in that area of the city's business." City of St. Louis

v. Praprotnik, 485 U.S. 112, 123 (1988) (citing Pembaur, 475 U.S. at 482-83 and n. 12) (emphasis

in Praprotnik).

Even assuming that Cashin had final decision-making authority in Region 5, there is

nothing to suggest that her removal of plaintiff from BCHS was anything more than a

discretionary act. Plaintiff does not articulate a policy which was created by this action.

Moreover, in light of the elaborate statutory provisions governing the discipline of tenured

pedagogues, see N.Y. Educ. Law § 3020, 3020-a, this court cannot find that Cashin, as a Regional

Superintendent, was responsible for making any policies relating to the removal of tenured

principals. Defendant is therefore granted summary judgment with respect to plaintiff's claims

pursuant to 42 U.S.C. § 1983.

### Pendent State Claims

There is no need to address defendant's remaining two arguments. The first of these

relates to plaintiff's claims pursuant to State law and the New York City Administrative Code,

over which this court has pendent jurisdiction. However, the exercise of pendent jurisdiction is a

matter of discretion, not of right. See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).

Where all federal claims have been dismissed before trial, pendent state claims should be

dismissed without prejudice and left for resolution by the state courts.  See Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001) (collecting cases); 28 U.S.C. §1367(c)(3).  Because the court has dismissed plaintiff's federal law claims, it declines to exercise supplemental jurisdiction over plaintiff's State and local law claims.

The second of these arguments relates solely to what remedies plaintiff can recover in light of her alleged failure to mitigate damages.  Since this court has granted summary judgment to defendant with respect to all of plaintiff's federal claims and has declined to exercise pendent jurisdiction, there is no need to discuss remedies.

## *CONCLUSION*

For the foregoing reasons, defendant's motion for summary judgment is granted in its entirety.  The court declines to exercise supplemental jurisdiction over plaintiff's state and city law claims and, thus dismisses those claims without prejudice.  Plaintiff's action is dismissed. The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.


                                        _____/s/_____
                                        Allyne R. Ross
                                        United States District Judge

Dated:  September 30, 2007
         Brooklyn, New York

30